**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEAMFITTERS LOCAL 449 RETIREMENT SECURITY FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BADGER METER, INC., KENNETH C. BOCKHORST, ROBERT A. WROCKLAGE, and DANIEL R. WELTZIEN,<br><br>Defendants. | **Case No. 24-4660**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Steamfitters Local 449 Retirement Security Fund ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based upon the investigation of Plaintiff's counsel, which included, among other things, review and analysis of: (1) regulatory filings made by Badger Meter, Inc. ("Badger Meter" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) wire and press releases published by the Company; (3) analyst and media reports concerning Badger Meter; and (4) other publicly available information regarding Defendants (defined below). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Badger Meter common stock between April 18, 2024 and April 16, 2026, inclusive (the "Class Period"), and were damaged thereby. Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) Badger Meter, (ii) the Company's Chief Executive Officer ("CEO") Kenneth C. Bockhorst ("Bockhorst"), (iii) the Company's former Chief Financial Officer ("CFO") Robert A. Wrocklage ("Wrocklage"); and (iv) the Company's current CFO Daniel R. Weltzien ("Weltzien").

2. Badger Meter manufactures and sells water measurement and management products. Historically, the Company's business centered on traditional water meters used by municipal and regional utilities to measure water consumption for billing and system management purposes. Recently, Badger Meter expanded into advanced metering infrastructure ("AMI")

solutions, which allows utilities to collect usage data remotely through communication endpoints and software platforms.

3. This case arises out of Defendants' misrepresentations during the Class Period regarding the drivers of Badger Meter's "record" financial results, demand for the Company's products, and its prospects for continued growth.

4. During the Class Period, Defendants told investors that Badger Meter's strong financial results reflected "ongoing favorable industry trends," "secular growth drivers," and "solid operating execution." They likewise touted "strong" demand and said they were seeing "robust order pacing and a strong bid pipeline that positions us well for continued sales and earnings growth," and that Badger Meter possessed a "long runway" for growth.

5. In truth, rather than reflecting durable, demand-driven growth, Badger Meter's financial results were driven by the Company's practice of pulling-forward customer orders, which concealed weakening demand and deteriorating near-term order trends. The truth was revealed to investors over the course of a series of disappointing quarterly financial reports between July 2025 and April 2026.

6. On July 22, 2025, Badger Meter reported disappointing financial results for 2Q 2025, including earnings per share ("EPS") below consensus estimates, declining revenue growth, deteriorating margins, and warned "we expect absolute sales to decline sequentially in the third quarter of 2025." Instead of acknowledging the results reflected an exhaustion of previously pulled-forward revenue, Defendants said it was "simply the nature of the business" and blamed a gap caused by the completion of certain large AMI projects and delays in the start of others while stating "our funnel remains as robust as ever" and that demand softness was "not a concern."

7. Despite Defendants' assurances, on this news, the price of Badger Meter stock fell $40.42 per share, or 16.5%, from $245.22 per share on July 21, 2025, to $204.80 per share on July 22, 2025, on unusually heavy trading volume.

8. Next, on January 28, 2026, Badger Meter reported disappointing financial results for 4Q 2025, including missed revenue expectations and a "6% sequential decline in utility water sales." However, Defendants continued to blame the poor results on "previously communicated project pacing effects."

9. On this news, the price of Badger Meter stock declined $18.09 per share, or 11%, from $164.41 per share on January 27, 2026, to $146.32 per share on January 28, 2026, on unusually heavy trading volume.

10. Finally, on April 17, 2026, Badger Meter reported disappointing 1Q 2026 financial results including that total sales were "9% lower than the prior year[]," "[u]tility water sales declined 10% year-over-year," "[o]perating earnings of $35.2 million, with an operating margin of 17.4%, compared to operating earnings of $49.4 million and an operating margin of 22.2% in the prior year," and "[d]iluted earnings per share (EPS) of $0.93, down from $1.30 in the first quarter of 2025." Defendants again blamed "project timing," but also disclosed that "softer short-cycle municipal customer ordering" contributed to the disappointing financial results. Defendants also revealed that the "variability" in short-cycle demand seen in 1Q 2026 "has always existed, inclusive of [the] 2023 to 2025 time frame" but claimed it was "less visible in the revenue outcomes because of the backlog condition combined with projects in flight."

11. On this news, the price of Badger Meter stock fell $36.75 per share, more than 24%, from $152.29 per share on April 16, 2026, to $115.54 per share on April 17, 2026, on unusually heavy trading volume.

12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

14. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Badger Meter common stock trades on the New York Stock Exchange ("NYSE"), which is situated in this District, and the acts and conduct that constitute the violations of law asserted herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

16. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17. Plaintiff is Steamfitters Local 449 Retirement Security Fund. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Badger Meter common stock during the Class Period and has been damaged thereby.

18. Defendant Badger Meter is incorporated under the laws of Wisconsin with its principal executive offices located in Milwaukee, Wisconsin. Badger Meter's common stock trades on the NYSE under the symbol "BMI."

19. Defendant Bockhorst was the Company's CEO at all relevant times.

20. Defendant Wrocklage served as Badger Meter's CFO during the Class Period until January 1, 2026. Since January 1, 2026, Defendant Wrocklage has served as the Company's Executive Vice President – North American Municipal Utility.

21. Defendant Weltzien has served as Badger Meter's CFO since January 1, 2026.

22. Defendants Bockhorst, Wrocklage, and Weltzien (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23. Badger Meter manufactures and sells water measurement and management solutions. The Company historically built its business around the manufacture and sale of

mechanical water meters used by water utilities to measure consumption for billing and system management purposes.

24. Badger Meter's core customer base consists of municipal and regional water utilities, with demand historically largely driven by routine meter replacement cycles and incremental system expansion. As a result, for most of its history, the Company operated as a relatively mature, replacement-driven business. Revenue growth was steady but modest, reflecting the long useful lives of water meters, the conservatism of water utilities' purchasing decisions, and the absence of rapid technology-driven refresh cycles more common in other industrial sectors.

25. In recent years, Badger Meter increasingly focused on AMI, which allows utilities to remotely collect water usage data. As utilities gradually adopted AMI, the Company positioned itself as a leader in cellular-based AMI solutions, expanding beyond purely mechanical products while remaining focused on its core utility customers.

26. Badger Meter recognizes revenue from contracts with customers when control of its products passes to its customers, typically upon shipment or delivery in accordance with the applicable customer arrangement.

27. The COVID-19 pandemic accelerated Badger Meter's growth by increasing demand for remote metering solutions and disrupting normal purchasing patterns. Stay-at-home orders, social-distancing requirements, and limits on in-person field work made manual meter reading more difficult, prompting utilities to prioritize remote solutions such as AMI. At the same time, supply-chain disruption and operational uncertainty encouraged customers to order earlier than usual and in larger increments, and to move forward with planned meter replacements earlier to avoid potential delays.

28. This increased demand included both "short-cycle" purchases, such as replacement meters that convert to revenue quickly, and "long-cycle" AMI projects involving meters, communications devices, and software that could last years. As a result, Badger Meter reported substantial revenue growth well above its historical trends in 2023 and 2024, even as COVID-driven demand began to moderate.

**<u>Defendants' False and Misleading Statements Issued During the Class Period</u>**

29. The Class Period begins on April 18, 2024. On that day, Badger Meter reported its 1Q 2024 financial results in a press release that the Company filed on Form 8-K with the SEC and held an earnings conference call to discuss the financial results. In the press release and earnings call, Defendants touted Badger Meter's "record" results and attributed the Company's success to "ongoing favorable industry fundamentals," "solid operating execution," and a "strong bid pipeline," while stating that the Company maintained a "long runway" for continued growth.

30. Specifically, in the press release, Badger Meter "reported record results for the first quarter ended March 31, 2024" including "[r]ecord total sales of $196.3 million, 23% higher than the prior year's $159.1 million," "[o]perating profit increased 46% year-over-year, with operating profit margins expanding 290 basis points to a record 18.6% from 15.7%," and "[d]iluted earnings per share (EPS) increased 50% to $0.99, up from $0.66 in the comparable prior year quarter." In the press release, Badger Meter also stated, "[u]tility water sales increased 29% year-over-year reflecting continued customer adoption across our broad and expanding portfolio of smart water solutions."

31. The press release also quoted Defendant Bockhorst as stating, "[t]he continued strength in both customer demand and operating execution drove exceptional performance in our first quarter, with record quarterly revenue, operating profit and EPS results." He continued,

"[t]hese record results are reflective of ongoing favorable industry fundamentals, driving robust customer demand for our innovative smart water solutions."

32. During the earnings call, Defendant Bockhorst similarly stated, "[w]e continue to experience strong demand for our suite of utility smart water solutions, which benefited from ongoing favorable water industry fundamentals coupled with increased adoption of our innovative offerings" and "[w]e continue to see robust order pacing and a strong bid pipeline that positions us well for continued sales and earnings growth." Also on the earnings call, Defendant Bockhorst stated only "roughly 35% of the market" has "AMI implemented," so there is a "long runway of growth still in AMI."

33. On July 19, 2024, Badger Meter reported its 2Q 2024 financial results in a press release that the Company filed on Form 8-K with the SEC and held an earnings conference call to discuss the financial results. In the press release and earnings call, Defendants attributed Badger Meter's "record" results to the "continued strength of AMI demand," "customer-accelerated backlog conversion," "underlying secular growth drivers," and "an encouraging opportunity funnel, bid pipeline and order book."

34. Specifically, in the press release, Badger Meter "reported record results for the second quarter ended June 30, 2024," including "[r]ecord total sales of $216.7 million, 23% higher than the prior year's $175.9 million," "[o]perating profit increased 41% year-over-year, with operating profit margins expanding 240 basis points to a record 19.2% from 16.8%," and "[d]iluted earnings per share (EPS) increased 47% to $1.12, up from $0.76 in the comparable prior year quarter." The Company also stated, "[u]tility water sales increased 26% year-over-year reflecting broad-based growth across the comprehensive suite of smart water offerings, most notably the

adoption of our differentiated cellular AMI solution" and "sales also benefitted from the conversion of elevated backlog."

35. Also in the press release, Defendant Bockhorst attributed Badger Meter's "record" results to the "continued strength of AMI demand coupled with customer-accelerated backlog conversion," as well as "higher sales volumes, operational execution and continued selling, engineering and administration (SEA) expense leverage," and stated, "[o]ur resilient end markets, business momentum and our continued focus on innovation and execution provides us with confidence in our ability to increase shareholder value while we enable customers to preserve the world's most precious resource."

36. During the earnings call, Defendant Wrocklage stated, "[d]emand for our innovative suite of utility smart water solutions continued to benefit from underlying secular growth drivers, and we were able to make additional headway into our backlog in support of customers." Also during the earnings call, Defendant Wrocklage said, "[t]here is really no change to the multiple favorable macro drivers supporting the water industry growth fundamentals with an encouraging opportunity funnel, bid pipeline and order book boding well for continued sales and earnings growth."

37. On October 17, 2024, Badger Meter reported its 3Q 2024 financial results in a press release that the Company filed on Form 8-K with the SEC and held an earnings conference call to discuss the financial results. In the press release and earnings call, Defendants continued to discuss Badger Meter's "record" results which they attributed to "strong operating execution" and sales "unit volumes increasing," while insisting demand was "as solid as it's ever been."

38. Specifically, in the press release, Badger Meter reported "[t]otal sales of $208.4 million, 12% higher than the prior year's $186.2 million," "[o]perating profit increased 29% year-

over-year, with operating profit margins expanding 260 basis points to a record 19.5%," and "[d]iluted earnings per share (EPS) increased 23% to $1.08, up from $0.88 in the comparable prior year quarter," and "[r]ecord cash flow with $45.1 million in net cash provided by operations, which increased 43% year-over-year." The Company also stated, "[u]tility water sales increased 14% year-over-year against a difficult prior year comparison reflecting continued solid adoption" of its "suite of solutions by utility customers" including "increased sales of meters, water quality, pressure and other sensors."

39. Also in the press release, Defendant Bockhorst said, "[s]ales in the quarter continued to benefit from solid demand for our tailorable water management solutions," and attributed "record operating profit margins" to "favorable sales mix, price/cost management, strong operating execution and continued selling, engineering and administration (SEA) expense leverage."

40. During the earnings call, Defendant Wrocklage said, "[t]otal utility water product line sales increased 14% year-over-year, as we continue to deliver on solid demand for our . . . suite of utility smart water solutions" and "top line growth is not a function of just mix or pricing. It's absolutely unit volumes increasing." Also during the earnings call, Defendant Bockhorst said, "[a]ll the areas of the market that we look at from customers in the engineering phase to what's in the bid phase to what's in our backlog to what we're shipping remains as solid as it's ever been."

41. On January 31, 2025, Badger Meter reported its 4Q and full-year 2024 financial results in a press release that the Company filed on Form 8-K with the SEC and held an earnings conference call to discuss the financial results. In the press release and earnings call, Defendants continued to discuss Badger Meter's strong financial results which they attributed to the Company's "differentiated performance," "innovation and complementary acquisitions," "robust

adoption rates" for its AMI products, and the ability to "further capitalize on the robust demand environment."

42. Specifically, in the press release, Badger Meter reported, "[t]otal sales of $205.2 million, 13% higher than the prior year's $182.4 million," "[o]perating profit increased 22% year-over-year, with operating profit margins expanding 150 basis points to 19.1% from 17.6%," "[d]iluted earnings per share (EPS) increased 24% to $1.04, up from $0.84 in the comparable prior year quarter," and "[r]ecord cash flow with $52.1 million in net cash provided by operations, increasing 37% over the prior year." The Company also stated, "[u]tility water sales increased 14% year-over-year with solid growth across the broad suite of . . . technology solutions utilized by utility customers. Most notably, we continued to see robust adoption rates for our cellular AMI offering."

43. The press release also quoted Defendant Bockhorst as stating, "our track record of differentiated performance continued," which "coupled with execution of our strategic priorities, including investments in hardware and software innovation and complementary acquisitions, demonstrates our ability to further capitalize on the robust demand environment for comprehensive and tailorable digital water management solutions."

44. During the earnings call, Defendant Bockhorst stated, Badger Meter's "suite of comprehensive and tailorable solutions continues to see growing adoption as we address the variety of persistent macro water challenges customers face" and represented that "[o]ur durable business model is underpinned by replacement-driven demand, secular AMI adoption drivers and the expanding need for real-time data visualization and analytics." Defendant Bockhorst further stated, "[o]ur order book and opportunity pipeline along with constructive customer budgets continue to support the high single-digit average top line growth we've been communicating for

some time now" and "what we're seeing in terms of backlog and how order rates are flowing through, I would say, is very normal."

45. Also during the call, Robert W. Baird & Co. analyst Robert W. Mason stated "inventory did [end] up down a fair amount" and asked, "what the enabler of that was . . . does that come back up?" Defendant Bockhorst responded, "we thought inventory was [] an opportunity for us to continue to improve our processes. And frankly, that's what we've seen. We've had a great team working really hard at improving to get a better sustainable rate that just happens to be lower." Defendant Wrocklage added, "there's nothing anomalistic about" the inventory, "we're at an optimum level as we exit the year."

46. On April 17, 2025, Badger Meter reported its 1Q 2025 financial results in a press release that the Company filed on Form 8-K with the SEC and held an earnings conference call to discuss the financial results. In the press release and earnings call, Defendants attributed solid financial results to "[s]teady customer demand," "disciplined operating execution," and "the resilience and durability of" the Company's business model, while insisting that its strong financial results were not the product of customers pulling forward orders.

47. Specifically, in the press release, Badger Meter reported "[t]otal sales of $222.2 million, 13% higher than the prior year's $196.3 million," "[o]perating earnings increased 35% year-over-year to $49.5 million, with operating profit margins expanding 360 basis points to 22.2% from 18.6%," and "[d]iluted earnings per share (EPS) increased 31% to $1.30, up from $0.99 in the comparable prior year quarter," and stated, "utility water sales increased 12%, the result of ongoing customer adoption across the suite of our digital smart water solutions."

48. The press release also quoted Defendant Bockhorst as stating, "[s]teady customer demand and disciplined operating execution drove solid revenue growth and record margins in a

strong start to 2025." He continued, "[o]ur ability to build upon record results reflects the underlying stability of our business model as favorable industry fundamentals drive the need for our innovative smart water solutions" and "[o]ur first quarter results demonstrate the resilience and durability of our replacement-driven business amidst a volatile macroeconomic environment."

49. During the earnings call, analysts asked Badger Meter about the demand for its products. Deutsche Bank AG analyst Andrew Jon Krill asked, "is your core customer showing any signs of potentially pulling back on spending or delay spending with all the uncertainty [in the market]?" Defendant Bockhorst replied, "we're not seeing or hearing from customers anything on pullbacks. I think it's important [not] to forget the 100 years of history that talked about this being a very durable replacement-driven market."

50. Stifel, Nicolaus & Company, Inc. analyst Nathan Hardie Jones asked, "[i]s there any perception that customers might have pulled forward some orders into the quarter . . . ?" In response, Defendant Bockhorst stated, "2 things to remember is that 75% of our revenue is direct to end users [who] really, in many ways, cannot pull forward because they can't really put them into meter pits or homes faster and they don't have the warehouse space to typically hold it," and regarding the other 25%, "we've not seen large pull forward orders. So it was a pretty normal order environment."

51. Seaport Research Partners analyst Scott Graham asked, "if there was any specific change that you're seeing in present order rates. And it sounds like your answer to that is no, and it's because there are so many factors at play." In response, Defendant Bockhorst stated, "[t]hat's right. That's right. . . . And all of these levers continue to be strong, and we continue to take our one step forward at a time approach to how we manage and how we communicate that these drivers are real."

52. The statements referenced in ¶¶29-51 were materially false and misleading. Badger Meter's financial results during the Class Period were at least partially attributable to the Company's practice of pulling-forward customer orders to recognize revenue early, which concealed weakening demand and deteriorating near-term order trends. This practice also depleted revenue otherwise available for future periods, ultimately causing the disappointing financial results the Company later reported.

**Corrective Disclosures**

53. On July 22, 2025, Badger Meter reported disappointing 2Q 2025 financial results including EPS below consensus estimates, decelerating revenue growth, and margin deterioration. During the Company's earnings conference call held the same day to discuss the results, Defendant Bockhorst stated "we expect absolute sales to decline sequentially in the third quarter of 2025."

54. However, Defendants obscured the full truth. During the earnings call, Defendant Bockhorst attributed the disappointing results to "simply the nature of the business, given utility replacement cycles, project deployment schedules" and, specifically blamed, "a number of AMI projects [that] wrap[ped] up in the second quarter," and "[w]hile we already have new AMI projects in hand to replace them, the timing of the start of those projects" is delayed.

55. Also during the earnings call, Deutsche Bank AG analyst Andrew Jon Krill asked for clarity about the timing of the AMI projects, "is this like a change where they've been deferred our pushed out a little bit? Or is this more normal course of business?" He then asked, "can you maybe also just generally comment on like muni activity . . . because I think there have been some fears maybe of like a little bit of softness there."

56. In response, Defendant Bockhorst stated, "just trying to be transparent here that some projects have rolled off, but we certainly are excited about the projects that we'll be rolling

up that our funnel remains as robust as ever. So not a concern for the long term in any way." Regarding demand softness, he added, "we continue to spend a lot of time talking to customers" and "[w]e're every bit as bullish as we've ever been. So customer demand side in terms of people inquiring about new projects or moving forward with projects remains largely unchanged."

57. Despite Defendant Bockhorst's assurances, on this news, the price of Badger meter stock fell $40.42 per share, or 16.5%, from $245.22 per share on July 21, 2025, to close at $204.80 per share on July 22, 2025, on unusually heavy trading volume.

58. Then, on January 28, 2026, Badger Meter reported disappointing 4Q 2025 financial results including missed revenue expectations. Specifically, in the press release the Company filed on Form 8-K with the SEC announcing the financial results, Badger Meter revealed a "6% sequential decline in utility water sales versus" the previous quarter but blamed the results on "previously-communicated project pacing effects."

59. During Badger Meter's January 28, 2026 earnings conference call to discuss the financial results, Defendant Weltzien claimed that the "previously communicated project pacing effects resulted in a 6% sequential decline in utility water sales versus the third quarter of 2025." Additionally, when asked by Stifel, Nicolaus & Company, Inc. analyst Nathan Hardie Jones, "[a]ny help you can give us with how we should think about first half versus second half gross margins . . . or how we should think about the full year for gross margins," Defendant Weltzien responded "there's nothing that we would specifically point to [and] say there's going to be variability from quarter-to-quarter."

60. Also during the call, Defendant Bockhorst stated, "the second half of 2025 included a concentrated mix of concluding AMI turnkey projects, resulting in a base revenue growth of 6%,

which was lower than our 5-year outlook," and noted this "dynamic" would "extend throughout the first half of 2026 until several awarded projects" begin.

61. On this news, the price of Badger Meter stock declined $18.09 per share, or 11%, from $164.41 per share on January 27, 2026, to close at $146.32 per share on January 28, 2026, on unusually heavy trading volume.

62. Finally, on April 17, 2026, Badger Meter reported disappointing 1Q 2026 financial results in a press release it filed on Form 8-K with the SEC, including "[t]otal sales of $202.3 million, 9% lower than the prior year's 222.2 million," "[o]perating earnings of $35.2 million, with an operating profit margin of 17.4%, compared to operating earnings of $49.4 million and an operating margin of 22.2% in the prior year," and "[d]iluted earnings per share (EPS) of $0.93, down from $1.30 in the first quarter of 2025." The Company also reported "[u]tility water sales declined 10% year-over-year." Badger Meter once again blamed "project timing," but also acknowledged the poor results were caused by "softer short-cycle municipal customer ordering."

63. During the Company's April 17, 2026 earnings conference call to discuss the financial results, Defendant Bockhorst further stated that "short-cycle order rates for which visibility is always more limited, were weaker than we anticipated, resulting in approximately $15 million to $20 million of lower revenue versus our internal expectations."

64. Also during the earnings call, Stifel, Nicolaus & Company, Inc. analyst Nathan Hardie Jones asked about the "underlying reasons" for the softness in the short-cycle orders. In response, Defendant Wrocklage said the short-cycle "variability" seen in 1Q 2026 "has always existed, inclusive of [the] 2023 to 2025 time frame," but claimed it was "less visible in the revenue outcomes because of the backlog condition combined with the projects in flight." He later said that this variability had "always existed" and that it's just now "happening to be more visible."

65. On this news, the price of Badger Meter stock declined $36.75 per share, or more than 24%, from $152.29 per share on April 16, 2026, to close at $115.54 per share on April 17, 2026, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Badger Meter common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of Badger Meter, and their families and affiliates.

67. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

68. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A. Whether Defendants violated the Exchange Act;

B. Whether Defendants omitted and/or misrepresented material facts;

C. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D. Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E. Whether the price of Badger Meter's common stock was artificially inflated;

F. Whether Defendants' conduct caused the members of the Class to sustain damages; and

G. The extent of damage sustained by Class members and the appropriate measure of damages.

69. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

70. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

71. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE

72. At all relevant times, the market for the Company's common stock on the NYSE was an efficient market for the following reasons, among others:

A. The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

B. As a regulated issuer, Badger Meter filed periodic public reports with the SEC;

C. Badger Meter regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D. Badger Meter was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

73. As a result of the foregoing, the market for Badger Meter common stock promptly digested current information regarding Badger Meter from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of Badger Meter's common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices, and the presumption of reliance applies.

74. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## NO SAFE HARBOR

75. Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

76. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiff and the Class purchased Badger Meter's common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Badger Meter common stock during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

77. During the Class Period, as alleged herein, the Individual Defendants acted with scienter because the Individual Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

78. The Individual Defendants permitted Badger Meter to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

79. The inference of the Individual Defendants' scienter is bolstered by statements made at the end of the Class Period by the Individual Defendants themselves, including admissions that short-cycle demand "variability" "has always existed, inclusive of [the] 2023 to 2025

timeframe," but was purportedly "less visible in the revenue outcomes because of the backlog condition combined with the projects in flight."

80. Defendants' scienter is also inferred by their repeated discussion of customer demand, backlog, and the absence of customer pull forward when presented with questions from investment analysts during the Class Period. That Defendants spoke on such topics with authority indicates that they knew or recklessly disregarded the true facts known to them at the time, or did not conduct a reasonable inquiry into the matters.

81. The Individual Defendants made the challenged statements specified herein either knowing that they were materially false and misleading when made, or with reckless disregard for their truth. Given the Individual Defendants' positions within the Company and their direct involvement in and access to internal reports, metrics, and information concerning the matters addressed in their statements, the Individual Defendants knew, or were at least reckless in not knowing, that their challenged statements were inconsistent with the Company's actual financial position.

82. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Badger Meter, their control over, and/or receipt and/or modification of Badger Meter's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Badger Meter, participated in the fraudulent scheme alleged herein.

83. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Badger Meter common stock by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding Badger Meter's business, operations, and

management and the intrinsic value of Badger Meter common stock and caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## CLAIMS AGAINST DEFENDANTS

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

84. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

85. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Badger Meter common stock at artificially inflated prices.

86. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially inflated market prices for Badger Meter common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Badger Meter's business, as specified herein.

88. During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business, as specified herein, from the investing public and to support the artificially inflated prices of the Company's common stock.

90. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Badger Meter's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

91. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

92. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

93. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

94. The Individual Defendants acted as controlling persons of Badger Meter within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations,

and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

95. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

96. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Badger Meter common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated: June 2, 2026

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Javier Bleichmar*

Javier Bleichmar
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com

-and-

Nancy A. Kulesa
Ross Shikowitz
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com
rshikowitz@bfalaw.com

*Counsel for Plaintiff Steamfitters Local 449 Retirement Security Fund*

# CERTIFICATION

I, James A. Harding, on behalf of Steamfitters Local 449 Retirement Security Fund ("Steamfitters Local 449"), as Chairman of Steamfitters Local 449, hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of Steamfitters Local 449.

2. I have reviewed the Complaint against Badger Meter, Inc. ("Badger Meter") and others alleging violations of the federal securities laws and have authorized its filing.

3. Steamfitters Local 449 did not purchase or sell securities of Badger Meter that are the subject of the Complaint at the direction of counsel, or in order to participate in any private action under the federal securities laws.

4. Steamfitters Local 449 is willing to serve as a representative party in this matter, including providing testimony at deposition and trial, if necessary.

5. Steamfitters Local 449's transactions in the Badger Meter securities that are the subject of the Complaint during the class period specified therein of April 18, 2024 to April 16, 2026, inclusive, are reflected in Schedule A, attached hereto.

6. For securities retained, Steamfitters Local 449 owns and holds legal title to the securities that are the subject of this litigation. For securities sold, Steamfitters Local 449 owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7. Steamfitters Local 449 has sought to serve as a representative party in a class action filed under the federal securities laws during the last three years, in the following:

- *Yung v. Eos Energy Enterprises, Inc.*, No. 2:26-cv-02372 (D.N.J.)
- *Bradley v. Open Lending Corporation*, No. 1:25-cv-00650 (W.D. Tex.)
- *Quinn v. Viatris Inc.*, No. 2:25-cv-00466 (W.D. Pa.)

- *Korver v. Sage Therapeutics, Inc.*, No. 1:24-cv-06511 (S.D.N.Y.)
- *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc.*, No. 3:24-cv-05102 (N.D. Cal.)

8. Beyond its *pro rata* share of any recovery, Steamfitters Local 449 will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 2nd day of June, 2026.

James A. Harding
Chairman
*Steamfitters Local 449 Retirement Security Fund*

**SCHEDULE A**

TRANSACTIONS IN

BADGER METER, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 01/29/2026 | 96.00 | 144.42 | ($13,864.32) |